IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MELLER OPTICS, INC. d/b/a<br>LASER RESEARCH OPTICS,<br><br>Plaintiff,<br><br>v.<br><br>BRUCE SUNDERLAND, GARY SUNDERLAND<br>NIPPON AMERICA LTD. and<br>SUNDERLAND & ASSOCIATES<br><br>Defendants. | ) | C.A. No. 05-307-S |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, Meller Optics, Inc. ("Plaintiff" or "Meller Optics"), hereby submits this Memorandum of Law in support of its motion for preliminary injunction under R.I. Gen. Laws §6-41-1 and the common law, in order to prevent the continued misappropriation of and intentional misuse of Plaintiff's valuable trade secrets and other confidential business information by Defendants Bruce Sunderland ("Bruce Sunderland"), Gary Sunderland ("Gary Sunderland"), Nippon America Ltd. ("Nippon"), Sunderland & Associates ("Sunderland & Associates) and Design Research Optics ("Design Research Optics") (collectively "Defendants").

On July 1, 2005, Defendants created a new company, Design Research Optics, a direct competitor of Meller Optics. Since July 1, 2005, Defendants have engaged in active solicitation of Meller Optics' customers using Meller Optics' trade secrets and proprietary customer information in violation of the Rhode Island Trade Secrets Act, the

common law, the Employment Agreement Bruce Sunderland signed at the outset of his employment and in violation of the Sales Representative Agreement entered into on October 1, 2000 by Nippon. For the reasons set forth below, Plaintiff will succeed on the merits of its claim against Defendants, and will suffer irreparable harm should the injunction not issue. This Court should grant Plaintiff's request for injunctive relief.

## STATEMENT OF FACTS

**Laser Research Optics' Business**

Meller Optics, Inc. is a corporation duly organized and existing under the law of the State of Rhode Island, having its principal place of business at 120 Corliss Street, Providence, Rhode Island. Meller Optics is engaged in the business of fabrication, manufacture, sales and distribution of optics for industrial $CO_2$ lasers. All of Plaintiff's optics are cut and shaped in-house in Providence, Rhode Island. Plaintiff stocks approximately $1 million worth of $CO_2$ laser inventory at any given time so that customers can rely on prompt shipment of their orders. Defendant Bruce Sunderland founded Laser Research Optics in 1992. Thereafter, Laser Research Optics operated as a division of Defendant Nippon from 1992 through 1995.

Meller Optics purchased Laser Research Optics from Nippon on October 31, 1995. Pursuant to paragraph seventeen (17) of the purchase and sales agreement, defendants Nippon and Bruce Sunderland agreed as follows:

> *Covenant not to Compete.* While Bruce Sunderland is employed by Buyer, Seller agrees not to compete with Buyer in the business conducted by LRO or to perform any consulting or advisory service for or make any substantial investment in any company or other business venture engaging in said business. Seller further agrees that no data, confidential information, trade secrets, customer lists or other information related to the LRO business

> will be communicated to any other party during said period of time without Buyer's written consent.

Furthermore, as part of this purchase and sales agreement, Plaintiff acquired Defendant Nippon's existing customer list. The relevant provision of the purchase and sales agreement reads as follows:

> 1. *Assets and Business Being Sold.* Seller agrees to sell and Buyer agrees to purchase all of the assets of the business known as LRO and said business, with the exception of such items and assets which are delineated in Section 2 of this Agreement. Without imposing any additional limitations on the generality of the preceding sentence, the assets being so conveyed are as follows:
>
> E. The customer lists, vendor lists and sales and marketing records maintained by Seller for the LRO business;

As of October 31, 1995, Meller Optics owned Laser Research Optics, including its original confidential customer list. From that date forward, Meller Optics treated its customer list and customer information as its confidential, proprietary information, and made it available to its employees and sales representatives only as needed in the conduct of the business.

**<u>Bruce Sunderland's Employment with Meller Optics, Inc.</u>**

On October 31, 1995, Plaintiff entered into a five year Employment and Compensation Agreement with Bruce Sunderland whereby Sunderland would sell and manage the sales of all $CO_2$ and related optics for Plaintiff. Pursuant to paragraph seven (7) of the Employment Agreement, Sunderland agreed as follows:

> *Trade Secrets*. Employee agrees, that absent Employer's express consent and except while conducting Employer's business, he shall not disclose to any person or entity any proprietary information regarding Employer, including its business, customers, products, prices, other employees or manner of doing business. In the event

> of a breach of this provision, Employer shall be entitled, without barring any other remedies, to injunctive relief prohibiting Employee from disclosing such information, and this provision shall survive any termination of this Agreement. This provision shall not be construed to apply to proprietary trade information relating to the business conducted by Laser Research Optics after Employee is no longer employed by Employer.

**<u>The Sales Representative Agreement with Nippon</u>**

Bruce Sunderland's employment with Plaintiff ended in October 2000. Thereafter, on October 1, 2000, Plaintiff and Nippon entered into a five (5) year Sales Representative Agreement. Pursuant to this agreement, Nippon would sell and manage the sales of all $CO_2$ and related optics and other optical lines developed and produced by Plaintiff. Nippon's duties under this Sales Representative Agreement were carried out by its officers, Bruce Sunderland and Gary Sunderland. Pursuant to paragraphs five (5) of the Sales Representative Agreement, Nippon agreed as follows:

> 5. *Trade Secrets*. Representative agrees, that absent Employer's express consent and except while conducting the Employer's business, he shall not disclose to any person or entity any proprietary information regarding Employer relative to its business, customers, products, prices, other employees or manner of doing business. In the event of a breach of this provision, Employer shall be entitled, without barring any other remedies, to injunctive relief prohibiting Representative from disclosing such information. This provision shall survive any termination of this Agreement. This provision shall not be construed to apply to proprietary trade information relating to the business conducted by Laser Research Optics after Representative is no longer under contract with the Employer.

About 95 percent of Nippon's business related to the $CO_2$ laser optical components it sold for Meller Optics. (Sunderland deposition transcript, p. 16, l. 19-21). The remaining 5 percent of the business involved export trading, student services, and language consulting unrelated to laser optical components. (Sunderland deposition transcript, p. 18-23).

**Meller Optics' Diligent Efforts to Develop and Grow a Confidential Customer Base**

Meller Optics purchased Laser Research Optics and its original customer list in 1995. At that time, approximately one hundred (100) names were on the customer list. After ten years of hard work, Meller Optics increased its master customer list to include approximately 1,650 qualified customers. Plaintiff's customers include a multitude of residential, commercial and industrial purchasers. There is no specific industry that purchases $CO_2$ laser optics. A myriad of manufacturers are potential customers. $CO_2$ lasers are used in the heat treating, scribing, drilling, cutting, machining, engraving, welding, trimming, laser damage testing, brazing, hardening, cladding, sealing, ablation, scraping, dicing, edge grinding, etching and perforation processes. In fact, $CO_2$ lasers are used in countless industries for various applications, including but not limited to:

> screen printing, dental alloys for bridges and implants, jewelry manufacturing & repair, welding of alloys, sheet metal cutting, drilling, trimming for automobiles, automation machinery, food processing equipment, dairy and pharmaceutical equipment, wood cutting, shaping & burning, tube cutting, pipe punching, contouring and shaping of tools such as cutters, chisels, surgical knives, fiber cutters, heat sinks, box cutting and enclosure panels, heart & artery stent manufacturing, permanent marking of metals and plastics alloys, laser beam steering, micromachining and laser trimming on film circuits, silicon, polyimides, and ceramic substrates, turbine engine liner slot and hole cutting for jet engines, 3D thermal forming of objects, laser cutting and veneering of lumber, microvia drilling, 3D modeling, cutting, stamping and fabrication of fiber, nylon, Teflon, polyethelene, polypropylene, nomex and formex, fabrication of stainless, brass and aluminum handrails, fabrication of metal stampings, specialty washers and custom gaskets, manufacture of parts for pressure washers, crane parts, man lift parts, pavers, asphalt equipment, environmental equipment, tire building equipment, laser welding systems for auto and machine production, laser ablation and perforation of packaging materials and textiles, laser marking of medical, dental, aircraft, automotive & electrical components, laser fusion and hermetic sealing applications, stencil and mask cutting, brass etching, corian and Lucite scribing, patterning of ITO electronic

> components, fabrication of linoleum, Kevlar, and composites, micromachining systems, aviation construction industries, distance control and positioning systems, fabrication of instrument panels, phone booths, railcar interiors and food packaging equipment, airbag cutting, hydroforming part cutting, heavy sheet metal cutting, coders for food and cosmetics, manufacture of embolic protectors and catheter components, polymer microwelding, laser wire stripping, paint stripping, plastic surgery and skin treatment, epoxy printing applications, cutting of vinyl, fabrics, cardboard, sailcloth and other soft goods, fabrication and welding for chutes and tanks, manufacture of signs, toll booths, toll road equipment and railway equipment, manufacture of metal battery casings, and the cutting and fabrication of razor blades.

Sunderland admitted that $CO_2$ lasers are used by a wide range of industries in a wide range of diverse applications. He explained that "multitudes of industries" use $CO_2$ for many applications, including the textile, marking, welding, metal fabrication, biomedical, and aerospace industries. (Sunderland deposition transcript, p.55-56). "There are so many customers that use the same components. They are everywhere." (Sunderland deposition transcript, p. 55). Meller Optics' specific customer list and database, developed from this wide range of industries, are not readily ascertainable through ordinary business channels.

Plaintiff has invested much time, effort and money to develop its customer base over the past ten (10) years. Plaintiff ran targeted advertisements monthly in the Industrial Laser Solutions Magazine at a cost of approximately $31,000.00 per year. Plaintiff ran monthly press releases through Venmark International at a yearly cost of approximately $29,600.00. Plaintiff purchased monthly reports of UCC filings for $CO_2$ lasers from Equipment Data Associates (because these companies were certain to need replacement optics at some time in the near future) for approximately $2,500.00 per year. Plaintiff paid all hosting, design, and maintenance fees related to the Laser Research

Optics website for approximately $15,000.00 per year. Plaintiff attended Trade Shows in order to procure new customers for approximately $20,000.00 per year. Plaintiff printed and paid postage on monthly postcard mailings to its customer list which cost approximately $36,000.00 per year. Plaintiff maintained up to date Catalogs and Brochures for distribution to its customer base for approximately $20,000.00 per year. Plaintiff's phone bills and facsimile charges related to sales and customer communications totaled approximately $24,000 per year. In total, Plaintiff estimates that it spent approximately $178,100.00 per year in efforts to procure, secure, and maintain customers in addition to the monies it paid Sunderland and Nippon to work on that effort. Plaintiff's detailed customer lists and databases reflect these diligent efforts. Bruce Sunderland admitted at his deposition that this customer base developed between 1990 and 1995 by going to trade shows, word of mouth, referrals, leads from various sources, research efforts and cold calls. (Sunderland deposition transcript, p.54, l. 15-24).

Plaintiff's customer list not only included contact information, but also price points and information regarding purchase cycles, quantities of purchases and sales histories. Plaintiff's customer list and the repeat nature of the business which flows from those customers form the backbone of Plaintiff's business.

**<u>Meller Optics' Customer Lists and Other Proprietary Information Have Been Treated as Trade Secrets by Plaintiff and Defendants for the last Ten Years</u>**

As part of the Purchase and Sales Agreement, Meller Optics bought Laser Research Optics' original customer list. The fact that Nippon sold this list to Meller Optics illustrates that Nippon considered Laser Research Optics' customer list to be proprietary information, even as early as 1995. Over the next ten years (1995 through

June 2005), Plaintiff continued to maintain and add to its confidential qualified customer list and customer database, including customer sales and pricing information.

Bruce Sunderland utilized Filemaker software for the Meller Optics' customer information database since about 1990. (Sunderland deposition transcript, p. 43-44, l. 24-25 & 1-3).[1] This database organized proprietary information belonging to Meller Optics. According to Bruce, he maintained quotes to customers (including dates), schedules of customer purchases, sales invoices (including dates), pricing information, customer contact information including company name, address, phone number, fax number and contact people, and after he became a manufacturer's representative he even added the number of lasers owned by some customers to the Filemaker database. (Sunderland deposition transcript, p.43-46). Bruce Sunderland maintained this database within the scope of his employment with and representation of Plaintiff and it contains Meller Optics' proprietary trade secret information which must be protected. All sales lists constructed from the UCC filing searches, website lists, and customer lists purchased by Plaintiff were first added to Plaintiff's database at Meller Optics, Inc. and then immediately sent over to Bruce Sunderland at Nippon for use in Sunderland's sales efforts on behalf of Meller Optics. All new orders and quote requests were initially routed through Nippon's Sales Office (Bruce Sunderland); sales information was given to Plaintiff only after it became an order. The Meller Optics' database was synchronized with the database at Nippon in real-time on a daily basis. (Sunderland deposition

[1] Filemaker is a database that can import virtually any type of information including Microsoft Excel files, Access data, digital pictures, movies, etc. without any date entry required. Filemaker has the ability to import and download data from other databases and organize into whatever format is desired by the user. Filemaker can create and manage complex mailing lists and complex inventory tracking systems, by obtaining information from other databases and organizing it all in one place so that the user may have instant access to the information and files that he/she may need. For more information on the capabilities of Filemaker, please refer to http://www.filemaker.com.

transcript, p. 70, l. 20-25). Bruce Sunderland, therefore, is in possession of this proprietary customer and sales information that clearly constitutes plaintiff's trade secrets.

In addition to the Filemaker database, for a period covering four to five years of the business relationship, Meller Optics' ACT database was synchronized with Nippon's database system. Bruce Sunderland developed the Meller Optics customer list as a paid employee or sales representative of Meller Optics as part of his responsibilities to Meller Optics. Defendants remain in possession of a copy of the ACT clone, which contains history files and customer information, in addition to the Filemaker database.

Only employees and sales representatives of Meller Optics had access to its customer lists and databases. When a former Sales Representative of Meller Optics, Mr. Nick Matsukevich, was terminated, Bruce Sunderland made diligent efforts to personally obtain the former employee's computer from his San Diego, California office because it contained customer information and leads belonging to Meller Optics and Matsukevich had been working in Meller Optics' database. (Sunderland deposition transcript, p.134-137). Sunderland admitted at deposition that he didn't want the information getting into anybody else's hands, particularly a competing company, and that he was protecting the company from information theft. Sunderland was so concerned that Meller Optics' confidential customer information might have gotten into the wrong hands that he hired a forensic computer expert to determine if customer information in the computer had been compromised or accessed. (Sunderland deposition transcript, p.137-140).

**Bruce Sunderland's Attempts to Establish a Competitive Business Using Meller Optics' Customer Lists and Databases**

In late 2004/early 2005, Bruce Sunderland purchased a large customer list from Ealing, unbeknownst to Plaintiff. Sunderland admitted that he may have bought other leads as well. (Sunderland deposition transcript, p. 64, l. 16-19). At the same time, Bruce Sunderland purchased an inventory of Coherent laser optics for approximately $50,000. Plaintiff only learned of these purchases *after* the delivery of the inventory had been made to Bruce Sunderland's home address. When confronted about these secret purchases, Bruce Sunderland told Plaintiff that he had planned to sell this inventory on the side. This was a clear violation of the Sales Representative Agreement.

On June 30, 2005, Meller Optics terminated the Sales Representative Agreement due to Nippon's various breaches, including the secret registering of the LASER RESEARCH OPTICS trademark and various other domain names, the secret linking of a competitor's domain name to the Laser Research Optics website, and the refusal to transfer Laser Research Optics' domain name to Meller Optics. The letter also requested the immediate return of all customer lists, databases and other proprietary information owned by Meller Optics. Defendants have yet to return Plaintiff's customer lists and databases.

Immediately after the termination, in a mass electronic and facsimile mailing sent on or around July 5, 2005, Bruce Sunderland contacted approximately 300 customers of Meller Optics soliciting them to transfer their business to his new company, Design Research Optics. (Sunderland deposition transcript, p. 74, l. 18-20 & p. 77, l. 5-13). Sunderland stated that in deciding to whom these e-mails and faxes should be sent that he selected customers with whom Meller Optics was doing business on a regular basis.

(Sunderland deposition transcript, p. 75, l. 23-25). Sunderland openly informed current Meller Optics' customers that *"My sales staff and I have decided to start a new optics company effective immediately, and have no further affiliation with Laser Research Optics, Division of Meller Optics, Inc."* Sunderland further informed Laser Research Optics' customers, *"I truly appreciate all the support your orders have made to my success,* ***and hope that you will continue to contact our new company for your requirements.****"* Defendants directly utilized Meller Optics' customer lists, customer databases and current sales activity information in this solicitation.

**Defendants' Use of Plaintiff's Trade Secrets and Confidential Information**

During Defendants' ten (10) year business relationship with Plaintiff, Defendants obtained and had access to ***all*** information regarding Plaintiff's pricing structure for its $CO_2$ optics products and other related optic products, Plaintiff's product sales history information, and purchase history information.

Bruce Sunderland admitted that at the time he started Design Research Optics (early July 2005) he had "desk notes" and business records relating to Meller Optics' business, historical information regarding sales, sales order records and quotation records, all of the accounting records and invoices relating to Meller, and contact information for Meller Optics' customers. He further testified that he has the ability to determine who Meller Optics' top twenty customers are based on the information he possesses. Defendants still have this information. (Sunderland deposition transcript, p. 59-62).

Defendants have also used Plaintiff's trade secrets and other confidential information to provide price quotes for Defendants' competing $CO_2$ laser products to new

customers of Defendant Design Research Optics and to fulfill new orders for such products that Defendants received after the Sales Representative Agreement was terminated on June 30, 2005.

Sunderland admitted that he gave a quotation on behalf of Design Research Optics to the company Fuji Toke for the same parts that Fuji had previously ordered from Meller Optics. (Sunderland deposition transcript, p.96, l. 11-15). Sunderland further admitted that he was aware that Fuji cancelled the order that it had previously placed with Meller Optics. (Sunderland deposition transcript, p. 95, l. 16-19). In less than one month of operation, Defendants have already stolen at least one existing order from Meller Optics.

The Defendants' initial defense articulated by its prior counsel is false. Nippon did not represent any other related product "lines" between 1995 and the present. In fact, any such representation would have been a violation of the Sales Representative Agreement. It is undisputed that Defendants have established a company that now competes directly with Meller Optics in the laser optics industry. It is also clear that Defendants have been unfairly competing by using Plaintiff's confidential customer lists and databases to solicit business since at least July 5, 2005.

**Bruce Sunderland's Assertion that Design Research Optics' Customer Identities and Sales Information is Confidential**

During his deposition, Bruce Sunderland was questioned about his new company, Design Research Optics. He was asked which customers have placed orders with Design Research Optics thus far, and information regarding amounts of recent sales. (Sunderland deposition transcript, p. 6-9 & 84-85). Sunderland and his counsel asserted that they

considered the responses to these questions to be "confidential." The parties then stipulated, pursuant to a Protective Order, that Sunderland's responses may contain proprietary information about his company and that they would only be used for the purposes of this litigation. To state the obvious, Bruce Sunderland's assertion of confidentiality for Design Research Optics' customer and sales information is totally inconsistent with his stated position that such information owned by Meller Optics is not confidential and proprietary in nature.

## ARGUMENT

### I. The Court Should Enjoin Defendants from Unlawfully Competing with Plaintiff and from Misappropriating Plaintiff's Customer Lists and Other Confidential Information in Violation of the Uniform Trade Secrets Act

#### A. The Standard for Issuance of a Preliminary Injunction

The Rhode Island Supreme Court has consistently held that injunctive relief is particularly appropriate in circumstances involving misappropriations of information relating to an employer's customers. E.g., Colonial Laundries, Inc. v. Henry, 48 R.I. at 334, 138 A. at 49; Callahan v. Rhode Island Oil Co., 103 R.I. at 659, 240 A.2d at 413; Abbey Medical/Abbey Rents, Inc. v. Mignacca, 471 A.2d 189, 194 (R.I. 1984); see also R.I. Gen. Laws § 6-41-1 et seq.. The Plaintiff must show that (1) it is likely to succeed on the merits, (2) it will suffer irreparable harm if the injunction is not granted, (3) the balance of the equities favors Plaintiff; and (4) the injunction does not adversely affect the public interest. Leone v. Town of New Shoreham, 534 A.2d 871, 873 (R.I. 1987); Dilibero v. Swenson, 593 A.2d 42, 44 (R.I. 1991). In evaluating Plaintiff's likelihood of success on the merits, the court's inquiry is limited to whether Meller Optics has shown a

"reasonable probability, rather than a certainty, of ultimate success on a final hearing." Coolbeth v. Berberian, 112 R.I. 558, 566, 313 A.2d 656, 660 (1974).

### B. Plaintiff Will Succeed on the Merits of Its Claim for Misappropriation of Trade Secrets Against Defendants

In 1986, the General Assembly adopted the Uniform Trade Secrets Act (the "Act") as Rhode Island General Laws §§ 6-41-1 through 11. Section 6-41-2(a) of the Act specifically authorizes the court to enjoin the misappropriation of a trade secret. This is not a new development: the common law has always recognized that an injunction is the appropriate remedy to right or prevent the theft of a trade secret. See J.B. Prata, Ltd. v. Bichay, 468 A.2d 266, 268 (R.I. 1983); Restatement of Torts, § 757, comment e. In the trade secret context, a reasonable probability of success requires proof of ownership of a trade secret and proof that another party has acquired a trade secret by improper means. R.I.G.L. § 6-41-1.

#### 1. Plaintiff's Proprietary and Confidential Information, Including Customer Contacts, Customer Lists and Pricing Information are Trade Secrets Entitled to Protection

A trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business, which gives one an opportunity to obtain an advantage over competitors that do not know or use it. See R.I. Gen. Laws § 6-41-1. see also, Surgidev Corporation v. Eye Technology, Inc., 648 F. Supp. 669, 687 (D. Minn. 1986). A degree of secrecy must exist and the secret itself must be in some sense novel, although it need not approach the degree of novelty required under the patent laws. Atlantic Wool Combing Co. v. Norfolk Mills, Inc., 537 F.2d 866, 869 (1st Cir. 1966)

(quoting Restatement of Torts, § 757(c) (1937)). Trade secrets and similar confidential information provide a business entity with a competitive advantage in the marketplace.

Plaintiff's proprietary and confidential information, including databases, customer contacts, customer lists, customer contact information, product sales history information, parts numbering system, quotes, and pricing information fall squarely within this definition of trade secrets. Rhode Island law has long recognized that customer information can constitute a trade secret. A select list of customers built up through the investment of time and money constitutes a part of the good will of a business and is "confidential as would a formula showing how to mix certain ingredients to produce an article of commerce made only by the employer." Colonial Laundries, Inc. v. Henry, 48 R.I. 332, 336, 138 A.2d 47 (1927); Callahan v. Rhode Island Oil, Co., 103 R.I. 656, 660, 240 A.2d 411, 4 13 (1968). Furthermore, the Supreme Court of Rhode Island has stated that former employees may not use their acquaintances with customers to lure these customers away from their former employer. Colonial Laundries v. Henry, 48 R.I. at 335, 138A. at 49, citing, Stevens v. Stiles, 29 R.I. 399, 402, 71A. 802, 804 (1909). The law's protection extends beyond the identity of customers and includes other customer information, such as their specific needs. Regal Displays, Inc. v. Fornier, 119 R.I. 469, 474, 379 A.2d 1098, 1101 (1977). Only customer lists that are readily ascertainable or discoverable through a public hearing or ordinary business channels are *not* accorded the protection of a trade secret. See Callahan v. Rhode Island Oil Co., 103 R.I. at 661, 240 A.2d at 413 (refusing to protect list of retail suppliers of petroleum products). If a list of customers is classified in a public directory or discoverable by any public display of their

purchase of a product or service, the list is not confidential. Callahan v. Rhode Island Oil Co., 103 R.I. at 660. That is not the case here.

Plaintiff has acquired substantial expertise in targeting and marketing business entities that will particularly benefit from the products it provides. Through its marketing and service efforts, Plaintiff has created, maintained, and become the sole owner of certain valuable proprietary and confidential information, including customer histories, customer contacts, customer lists, and pricing strategies.

Plaintiff's customer lists are confidential. It is impossible to reconstruct Plaintiff's qualified customer list (which contains 1,650 customers) from any business or trade directory. Potential customers are not limited to laser manufacturers and refurbishers. Plaintiff's customers include a multitude of residential, commercial and industrial purchasers. (Sunderland deposition transcript, p. 55-56). Meller Optics has invested much time, effort and money to develop its customer base over a long period of time. Plaintiff ran targeted advertisements monthly in the Industrial Laser Solutions Magazine, ran monthly press releases through Venmark International, purchased monthly reports of UCC filings for $CO_2$ lasers from Equipment Data Associates (because these companies were certain to need replacement optics at some time in the near future), paid all hosting, design, and maintenance fees related to the Laser Research Optics website, attended Trade Shows in order to procure new customers, printed and paid postage on monthly postcard mailings to its customer list, maintained up to date Catalogs and Brochures for distribution to its customer base, and paid phone and facsimile charges related to sales and customer communications - - all in order to maintain and grow its customer base. In total, Meller Optics spent approximately $178,100.00 annually on

efforts to procure, secure, and maintain customers. As a result of Meller Optics' diligent efforts, its initial customer list of approximately 100 (purchased from Nippon in 1995) grew to approximately 1,650 over ten years.

In order to maintain trade secrets, such as those owned by Plaintiff, one need only take reasonable precautions to ensure difficulty of discovery except by the use of improper means. See Anaconda Company v. Metric Tool and Dye Company, 485 F. Supp. 410, 422 (E.D. Pa. 1980); Greenberg v. Croyton Plastics Co., Inc., 378 F. Supp. 806, 816 (E.D. Pa. 1974). Plaintiff has taken great measures to maintain the secrecy of its confidential information. Non-disclosure agreements are executed by employees and others doing business with Meller Optics. Access to its customer and pricing information is limited and restricted. Plaintiff's sales representatives such as Nippon, are required to agree to keep all such information confidential, even after the Sales Representative relationship ends. Bruce Sunderland's own efforts on behalf of Meller Optics to retrieve confidential customer information from a terminated representative so it did not fall into the hands of competitors is an example of Meller Optics' protective measures. (Sunderland deposition transcript, p. 134-137).

It has taken Plaintiff years of servicing particular customers to develop its specific client information. For a competitor, such as Design Research Optics, to be able to obtain and use such customer specific information without the effort of developing information on its own will give it an obvious and substantial competitive advantage in the marketplace - - an advantage that it has not earned through its own efforts and therefore does not deserve. The information concerning Plaintiff's clients, including their identities and their particular pricing requirements, sales history and sales cycles would

be impossible for a competitor such as Design Research Optics to duplicate quickly on its own. To misappropriate such information from Plaintiff would obviously save Defendants a great deal of time, effort and money that they would otherwise need to expend in order to obtain such information on their own, if they were able to do so at all. Accordingly, Plaintiff's client specific information and pricing information is protectable as a trade secret, and Defendants should be restrained from using or otherwise disclosing such confidential customer information.

In 1987, the United States District Court for the District of Rhode Island decided a case in which plaintiff Home Gas Corporation of Massachusetts had passed on its list of customers to defendant DeBlois Oil Company for business purposes. Home Gas Corporation of Massachusetts v. BeBlois Oil Co., 691 F. Supp. 567 (D.R.I. 1987). Defendant's employment agreement required the defendant to solicit customers for plaintiff, but defendant later used this list to solicit plaintiff's customers for his own business. This Court held, "The fact that additional names were added to the list by defendant does not change the agreement or the confidential nature of the list." Home Gas Corporation of Massachusetts v. BeBlois Oil Co., 691 F. Supp. at 574. See also Colonial Laundries, 48 R.I. at 336. This Court was further persuaded to enjoin the use of the customer list because "there was additional trade information compiled that is confidential." Home Gas Corporation of Massachusetts v. BeBlois Oil Co., 691 F. Supp. at 575. The Court relied on the First Circuit's ruling in American Eutectic Welding Alloys Sales Co. v. Rodriguez, 480 F.2d 223 (1st Cir. 1973) which involved an employee who had been given "customer cards with the name and address of each customer as well as each customer's specialized requirements, the contact person and the company's

pricing policies." American Eutectic Welding Alloys Sales Co. v. Rodriguez, 480 F.2d at 226. The First Circuit ruled that this information was confidential and could not be used to benefit the former employee at the employer's expense. Id. It is clear that Meller Optics's customer list and customer database was developed over a long period of time at great expense. As in American Eutectic and Home Gas, if the confidentiality of Meller' customer list is compromised, a serious threat to the continued viability of Plaintiff's business is posed. Plaintiff's customer list and the repeat nature of the business which flows from those customers form the backbone of Plaintiff's business. Therefore, Defendants should be enjoined from using Plaintiff's customer list and database.

**2. Defendants Have Stolen Plaintiff's Trade Secrets.**

The theft of trade secrets by former employees or officers clearly constitutes the acquisition of a trade secret by improper means. R.I.G.L. § 6-41-1(A) & (B); Kewanne Oil Company v. Vicron Corp., 416 U.S. 470, 475 (1974); Surgidev. Corp., 648 F. Supp. at 694. As Plaintiff's Sales Representative, Defendant Nippon and Defendants Gary and Bruce Sunderland (as officers of Nippon), became intimately familiar with Plaintiff's confidential and proprietary customer information. This confidential list gave them information regarding volume of sales for each customer, current prices being used and paid by customers, and approximate times when customers would need replacement optics. Defendants have failed to return such confidential and proprietary information upon termination of the Sales Representative Agreement and have ignored Plaintiff's requests to do so.

Bruce Sunderland sold the original Laser Research Optics customer list to Plaintiff in 1995 as part of the Purchase and Sales Agreement and he sold his Ealing

customer list to Plaintiff in March of 2005. Likewise, Meller Optics' master customer list, as it existed in 2005, was clearly Plaintiff's property because it was generated within the scope of Bruce Sunderland's employment with Plaintiff and included customers obtained by numerous marketing efforts of Meller Optics.

Over the past several months, Defendants have used Plaintiff's trade secrets and other confidential business information in a competing business in the $CO_2$ laser industry. Defendants' theft and use of Plaintiff's information is blatant, egregious and intentional. Defendants, using Plaintiff's customer list and contact information, have directly contacted Plaintiff's customers in order to solicit business from them and announce the formation of Bruce Sunderland's competing business Design Research Optics. Plaintiff has established a reasonable likelihood of success on the merits of its misappropriation of trade secrets claim. Under these circumstances, the only appropriate remedy to prevent further injustice is an injunction prohibiting Defendants from future disclosure or use of Plaintiff's confidential customer information, lists, and databases and restricting Defendants' solicitation of Meller Optics' customers.

### C. Plaintiff Has Suffered And Will Continue To Suffer Irreparable Injury If The Injunction Is Not Granted.

The nature of irreparable harm and the need for an injunction in a case such as the present one is explained by the Court in Velo-Bind, Inc. v. Scheck as follows:

> What these categories of injury all have in common is the prospect that the employee will affirmatively harm the former employer other than merely being productive for another employer - - ... by siphoning off the Plaintiff's carefully gained customers, subjecting Plaintiff to a definite possibility of irreparable harm, which increases as long as it continues unrestrained. What is at stake here, is Plaintiff's good will built up over the years, which is not monetarily ascertainable.

See Velo-Bind, Inc. v. Scheck 485 F. Supp. 102, 109 (S.D.N.Y. 1979); see also, Mouldings, Inc. v. Potter, 315 F. Supp. 704, 711 (M.D. GA 1970) ("Irreparable harm and injury will be suffered by Plaintiff unless injunctive relief is granted as prayed for ... the Defendants are now taking advantage of personal relationships with customers established by them while in Plaintiff's employ and are engaged in an act of a vigorous campaign to divert these customers from Plaintiffs").

Defendant has misused Plaintiff's customer lists, customer contact information and product pricing information to make an immediate entry into the marketplace at little or no effort of its own. Unless injunctive relief is granted immediately, Defendants will continue to siphon off Plaintiff's carefully gained customers, thereby subjecting Plaintiff to irreparable harm.

Plaintiff has reason to believe that Defendants have already contacted their top twenty (20) customers who represent the bulk of Plaintiff's $2.5 million dollar business. More specifically, Plaintiff has averaged $220,000 per month in sales in the twelve months leading up to July 2005. In just one month of Defendants misappropriation and unfair competition, Meller Optics' sales have dropped significantly. Moreover, Plaintiff will lose valuable business opportunities which flow from the referrals of existing customers. The resulting loss of profits to Plaintiff is incalculable because it is impossible to determine the number or type of customers whose business will be diverted from Meller Optics as a result of Defendants' actions.

Misappropriation of customer lists and information seriously jeopardizes Plaintiff's continued viability and good will. Absent an injunction, Plaintiff will suffer irreparable harm as a result of having lost an irreplaceable asset.

**D. The Harm To Plaintiff Outweighs The Harm To <u>Defendants If The Court Issues an Injunction</u>**

Defendants will suffer no cognizable injury if enjoined from further misappropriation of Plaintiff's trade secrets. Plaintiff seeks only to protect its own confidential customer lists and does not seek to interfere with Defendants' future employment or Defendants' new business. Bruce Sunderland is free to use his sales experience, but *not* Plaintiff's confidential and proprietary trade secrets, to compete with Plaintiff. Unfair competition and misuse of Plaintiff's confidential information is not a protectable interest.

**E. The Public Interest Will Be Served By <u>The Issuance Of A Preliminary Injunction</u>**

The public interest is never served when illegal conduct is allowed to continue. On the contrary, the public's faith in the law is affirmed when courts promptly and firmly prevent wrongful conduct. The message that strong action by the court delivers to the public is that it will not countenance unfair, deceptive and illegal conduct by those who transact business.

Moreover, there is a strong public interest in protecting the trade secrets of business to foster the growth, development and success of business in Rhode Island. Towards that end, there is an equally strong public interest in enforcing employment contracts, freely entered into, which protect the confidences of an employer. An injunction would protect the integrity of confidential information which is crucial to the development and the growth of Meller Optics or any business. The public interest dictates the issuance of an injunction.

## II. **Bruce Sunderland Violated his Employment Agreement with Meller Optics and Nippon Violated Its Sales Representative Agreement with Meller Optics by Using Meller Optics' Confidential Customer Information to Solicit Customers for Their New Competing Business**

On October 31, 1995, Plaintiff entered into a five year Employment Agreement with Bruce Sunderland. According to this Agreement, Bruce Sunderland would sell and manage the sales of all $CO_2$ and related optics for Plaintiff. Pursuant to paragraph seven (7) of the Employment Agreement, Bruce Sunderland agreed as follows:

> 7. *Trade Secrets*. Employee agrees, that absent Employer's express consent and except while conducting Employer's business, **he shall not disclose to any person or entity any proprietary information regarding Employer, including its business, customers, products, prices, other employees or manner of doing business**. In the event of a breach of this provision, Employer shall be entitled, without barring any other remedies, to injunctive relief prohibiting Employee from disclosing such information, and **this provision shall survive any termination of this Agreement.** This provision shall not be construed to apply to proprietary trade information relating to the business conducted by Laser Research Optics after Employee is no longer employed by Employer.

Bruce Sunderland acknowledged, by signing the above Agreement, that Meller Optics was in possession of valuable trade secrets regarding its customers to which he would become privy.

When Bruce Sunderland's employment with Plaintiff ended in 2000, Plaintiff and Nippon entered into a five (5) year Sales Representative Agreement. Pursuant to this agreement dated October 1, 2000, Nippon would sell and manage the sales of all $CO_2$ and related optics and other optical lines developed and produced by Plaintiff. Nippon's duties under this Sales Representative Agreement were to be carried out by its officers, Bruce Sunderland and Defendant Gary Sunderland. Pursuant to paragraphs five (5) of the Sales Representative Agreement, Nippon agreed as follows:

> 5. *Trade Secrets*. Representative agrees, that absent Employer's express consent and except while conducting the Employer's business, **he shall not disclose to any person or entity any proprietary information regarding Employer relative to its business, customer, products, prices, other employees or manner of doing business.** In the event of a breach of this provision, Employer shall be entitled, without barring any other remedies, to injunctive relief prohibiting Representative from disclosing such information. **This provision shall survive any termination of this Agreement.** This provision shall not be construed to apply to proprietary trade information relating to the business conducted by Laser Research Options after Representative is no longer under contract with the Employer.

Nippon acknowledged, by signing the Sales Representative Agreement, that Meller Optics was in possession of valuable trade secrets with respect to its customers to which Nippon would become privy.

Defendants should be bound by the terms of their agreements wherein they agreed not to disclose Meller Optics' proprietary information regarding customers. Both contracts specifically provide for injunctive relief. Even absent an agreement, employees and sales representatives owe their employer a fiduciary duty of loyalty not to disclose or use trade secrets. See Rego Displays, Inc. v. Fournier, 119 R.I. 469, 475 (R.I. 1977); Abbey Medical/Abbey Rents, Inc. v. Magnacca, 471 A.2d 189 (R.I. 1984).

"It is axiomatic that a court must construe a contract to give meaning and effect to each of its provisions." Nestle Food Company v. Miller, 836 F. Supp. 69, 77 n. 30 (D.R.I. 1993) See Crook v. Kalamazoo Sales & Service, Inc., 82 R.I. 387, 393, 110 A.2d 266 (1954), *overruled on other grounds*, and Flori v. Allstate Ins. Co., 120 R.I. 511, 513 n. 2, 388 A.2d 25, 26 n. 2 (1978). The trade secrets provision of the Agreements at issue specifically states that, *"This provision shall survive any termination of this Agreement."* These Agreements, as with any contract, must be read so as to give meaning to all

provisions. Therefore, the sentence following the survival of termination clause cannot be interpreted to invalidate the survival clause as Sunderland has argued. The subsequent sentence reads, *"This provision shall not be construed to apply to proprietary trade information relating to the business conducted by Laser Research Optics **after** Employee (or Representative) is no longer employed by (or under contract with) Employer."* This provision clearly refers to proprietary information that might be acquired by Bruce Sunderland or Nippon ***after*** the termination of their Agreements. (i.e. proprietary information acquired from other sources in the future, *not* Meller Optics' proprietary information obtained during the term of employment or representation).

These Agreements prohibit Defendants from *"disclosing to any person or entity any proprietary information regarding Employer, including its business, customers, products, prices, other employees or manner of doing business"* that was obtained during employment with Meller Optics. Bruce Sunderland testified at his deposition that all of his sales efforts related to $CO_2$ laser optical components were made on behalf of Meller Optics. (Sunderland transcript, p. 100, l. 20-25). Sunderland further testified that he understood the *Trade Secrets* obligation in his agreement with Meller Optics would survive any termination and that he was not supposed to disclose any proprietary information regarding Meller Optics, including its business, customers, products, prices, other employees or manner of doing business. (Sunderland transcript, p. 106, l. 8-14). Defendants have callously disregarded their Agreements by actively soliciting customers for Design Research Optics with the help of Meller Optics' proprietary customer list and customer database.

## CONCLUSION

For the foregoing reasons, Plaintiff Meller Optics, Inc. d/b/a Laser Research Optics, requests that this Court issue a preliminary injunction enjoining Defendants from continuing to misappropriate its valuable trade secrets and other confidential information, including its customer lists and customer databases, and enjoining Defendants from further solicitation of Meller Optics' customers.

Respectfully submitted,

MELLER OPTICS, INC.
d/b/a LASER RESEARCH OPTICS

By its Attorneys:

William R. Grimm (#1938)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
Tel: (401) 274-2000
Fax: (401) 277-9600

## CERTIFICATION OF SERVICE

To:

Stacey P. Nakasian, Esq.
Duffey Sweeney & Scott, LTD
One Turks Head Place, Suite 1200
Providence, Rhode Island 02903

I certify that I hand-delivered a copy of this Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction to counsel of record, as above, on the 8th day of August, 2005.