SCANNED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MELLER OPTICS, INC., d/b/a LASER RESEARCH OPTICS,<br><br>Plaintiff,<br><br>vs.<br><br>BRUCE SUNDERLAND, GARY SUNDERLAND, NIPPON AMERICA LTD., and SUNDERLAND & ASSOCIATES<br><br>Defendant(s). | C.A. NO. 05-307S |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Defendants Bruce Sunderland, Gary Sunderland, Nippon America LTD. ("Nippon") and Sunderland & Associates hereby oppose the Motion for Prelminary Injunction filed by Plaintiff Meller Optics Inc. ("Meller"). Meller cannot demonstrate, as it must, a likelihood that it will succeed on the merits of its trade secret and relevant breach of contract claims. No contractual provisions exist between Meller and its former sales representative Nippon which prohibit Nippon from competing with Meller, from soliciting Meller's customers, or from using information that Meller deems proprietary. Notwithstanding those facts, Meller seeks to enjoin the Defendants from using in connection with their competing business certain customer contact information which is not confidential and can be readily ascertained from ordinary business channels. Because the information at issue does not constitute a trade secret, Meller is not likely to prevail

on its claims. Meller also cannot establish that it will suffer irreparable harm in the event preliminary injunctive relief is denied.

For these reasons, which are set forth at greater length in the accompanying memorandum, Plaintiff's Motion for Preliminary Injunction should be denied.

Respectfully submitted,

Craig M. Scott, Esq. (#4237)
Stacey P. Nakasian, Esq. (#5069)
Duffy Sweeney & Scott, LTD
One Turks Head Place, Suite 1200
Providence, Rhode Island 02903
(401) 455-0700
(401) 455-0701 (Fax)

Attorneys for the Defendants

Dated: August 8, 2005

**CERTIFICATION**

TO: William R. Grimm, Esq.
Hinckley, Allen & Snyder, LLP
1500 Fleet Center
Providence, RI 02903

counsel of record on the 8th day of August 2005.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MELLER OPTICS, INC., d/b/a LASER RESEARCH OPTICS,<br><br>Plaintiff,<br><br>vs.<br><br>BRUCE SUNDERLAND, GARY SUNDERLAND, NIPPON AMERICA LTD., and SUNDERLAND & ASSOCIATES<br><br>Defendant(s). | C.A. NO. 05-307S |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Defendants Bruce Sunderland, Gary Sunderland, Nippon America LTD. ("Nippon") and Sunderland & Associates submit this memorandum in support of their opposition to the Motion for Prelminary Injunction filed by Plaintiff Meller Optics Inc. ("Meller"). In its motion, Meller seeks to prevent the Defendants from using certain customer contact information in connection with Nippon's new business, which competes with Meller. However, the information at issue – contact information concerning CO2 laser optic component customers[1] -- is neither confidential nor a trade secret. Such information is readily ascertainable through ordinary business channels. Moreover, no contract provision precludes Defendants' use of that information. Accordingly, Meller

[1] Although Meller alleges that Defendants are using other "Meller" information in connection with their competing business, they are not. The other information, which consists of Meller's historical sales to its customers, its pricing and quotations provided to customers, and lead lists purchased by Meller, has been removed from Nippon's computers and archived onto CD Rom discs. The Defendants have not used and do not plan to use such information in connection with their new business.

cannot demonstrate a likelihood of success on the merits of its claims. For that reason, and others discussed below, Meller's Motion for Preliminary Injunction should be denied.

## FACTS

Defendant Bruce Sunderland has spent his entire 28-year career marketing and selling CO2 laser optic components.[2] After graduating from college in 1978, Sunderland worked for several companies selling CO2 laser optic components before founding his own business in 1989. Significantly, none of the companies for which Sunderland worked prior to forming his own business ever required him to sign either a non-compete or non-solicitation agreement. Nor did any of those companies, to Sunderland's recollection, ever have a policy that customer names and contact information was proprietary or confidential.

In 1989 Sunderland formed his business, called Laser Research Optics ("LRO"), as a division of Nippon America Ltd. ("Nippon"), a corporation he and his wife had formed for other purposes years earlier. Over the next six years, Sunderland operated LRO, which sold and distributed CO2 laser optic components to industrial and commercial users and manufacturers worldwide.

In 1995 Sunderland was approached by Meller, which was not then in the business of manufacturing CO2 laser optic components. Meller offered to buy LRO's inventory and certain other assets, including its brand name and customer information. Meller did not commit to buy all of the inventory, but was given a right of first refusal as to any inventory it did not purchase at the closing. Meller agreed to pay book value for

[2] CO2 optic lasers are used to cut various materials including, but not limited to metals, plastics, textiles, and skin.

whatever inventory it purchased and to pay $1.00 for the other assets acquired, including LRO's brand name and customer information.

After the closing, Meller and Sunderland executed a five-year employment contact pursuant to which Sunderland managed and oversaw the sales efforts for Meller's CO2 and related optic lines. When the term of that contract expired, Meller and Nippon entered into a five-year Sales Representative Agreement pursuant to which Nippon agreed to manage all sales of Meller's CO2 laser and related optic lines. Meller terminated Nippon's Sales Representative Agreement on June 30, 2005.

Neither Sunderland's employment contract nor Nippon's Sales Representative Agreement contained any restrictions on Sunderland and Nippon's post-contract competition. Both contracts contained a virtually identical provision titled "Trade Secrets". The version of that provision in the Sales Representative Agreement provided:

> Representative agrees, that absent Employer's express consent and except while conducting Employer's business, he shall not disclose to any person or entity any proprietary information regarding Employer, relative to its business, customer, products, prices, other employees or manner of doing business. In the event of a breach of this provision, Employer shall be entitled, without barring any other remedies, to injunctive relief prohibiting Representative from disclosing such information. This provision shall survive any termination of this Agreement. This provision shall not be construed to apply to proprietary trade information relating to the business conducted by Laser Research Optics after Representative is no longer under contract with the Employer.

*See* Exhibit A to the Amended Complaint, para 5. The contracts, although prohibiting disclosure of Meller's confidential information, contained no prohibition against the use of such information.

Throughout his career, Sunderland has been involved in identifying customers for CO2 laser optic components, like the type Meller sells under the LRO brand. He will

testify that numerous public industry sources exist from which potential customers can be identified. These include trade directories that are available in hard form and in searchable form on the Internet. Examples of such directories are the Thomas Reigster (an online directory to 165,000 U.S. and Canadian manufacturers) and the Zycon Directory (a global directory of industrial manufacturers and distributors). Customers can also be found in industry buyer's guides, such as those published by Phototonics, the Fabricators & Manufacturers Industry Association, EuroLaser, and the Conference on Lasers and Electro-Optics (CLEO). Both the trade directories and buyer's guides are generally organized by trade segment and, thus, users of CO2 optic lasers can be easily identified. Customers can also be identified by attending relevant trade shows, such as the annual CLEO show, and by reviewing industry magazines, such as *Industrial Laser Solutions*. CD's containing all of the yellow pages in the country are also available for purchase. Those CDs can be searched by industry SIC codes to find potential customers. Another source of customer leads is referrals and cold calling.

Using these resources, Nippon has developed a contact list of customers and potential customers. In this action, Meller is claiming that to the extent that list contains the names of customers who purchased LRO products in the past, the list belongs to Meller. Nippon disputes that claim because the information is available through ordinary business channels and is not proprietary to Meller.

Meller did not provide any of the information used by Nippon and Sunderland to develop Nippon's contact list. Meller did from time to time purchase "lead" lists which it provided to Nippon. Such lists, which can be purchased in the marketplace, contain the results of public records searches. They contain the names of companies that purchased

or leased laser equipment as indicated in UCC filings. Neither Nippon nor Sunderland ever used those lead lists to develop customers because Sunderland thought such lists had little or no value and were not necessary in light of the other, better sources for finding clients. Nippon stored the lead lists provided to it by Meller in a separate datafile on its computer system. The Defendants have not used and do not plan on using any of the information in the leads list datafile in connection with their new business.

After its Sales Representative Agreement was terminated, Nippon started operating a new division, Design Research Optics, to manufacture and sell CO2 laser optic components. Nippon took no action to start this new business or to compete with Meller until after its contract was terminated by Meller.[3]

After the termination, Nippon deleted from its computers all historical information concerning sales to Meller customers and all pricing quotes provided to Meller customers. The Defendants have not used and do not plan to use any of that information in connection with their new business.

Shortly after the termination, Nippon sent a number of faxes and e-mails to some of its industry contacts, including many of Meller's customers. Sunderland felt it was important for his business contacts to know that he was no longer with Meller/LRO and that he had started a new CO2 laser optic component business called Design Research Optics. Sunderland sent the faxes and e-mails to those contacts that he had been most actively involved with prior to the termination. He will testify that many of those

[3] Nippon had registered the domain name Design Research Optics a few months prior to the termination of its Sales Representative Agreement. But at the time it did so, Nippon had no specific plan for the use of that name. Among other options, Nippon was considering using the name for a new product line to be developed with Meller.

contacts are friends and colleagues who needed to know that they could no longer reach him at LRO and who would want to know where he was currently working.
Nippon has breached the trade secret provision of its Sales Representative Agreement by failing to return the customer contact information and by using that information to contact Meller customers to inform them of Nippon's new business. Meller also claims that the Defendants used its proprietary information to provide competing quotes to its customers, but there is no evidence to support that claim. Meller seeks an injunction to prevent the Defendants from using contact information about its customers and requiring that all such information be returned to Meller.

The Defendants have not used any information that is proprietary to Meller. In fact, the Defendants have eliminated from their computers any information which arguably might be proprietary to Meller – the historical sales and pricing information – and they have not and are not using that information in connection with their new business. All the Defendants have done is to use contact information which is readily available through industry channels to inform potential customers of their change in business. In attempting to prevent the Defendants from doing so, Meller is trying to obtain protection against solicitation and competition that it did not contract for and that is not warranted under the law and facts of this case. Its efforts are a transparent attempt to prevent the Defendants from pursuing employment and competing fairly with Meller. Defendants also believe that this action was brought by Meller, in large part, as a preemptive strike to create leverage against the approximately $170,000 in commissions and product invoices owed by Meller to Nippon.

## ARGUMENT

A preliminary injunction is considered an extraordinary remedy because it involves the granting of interim relief before the facts are fully developed by a full-blown trial on the merits. *Wine and Spirits Retailers, Inc. v. State of Rhode Island*, 364 F. Supp. 2d 172 (D.R.I. 2005). Preliminary injunctive relief "will only be granted if the plaintiff has no adequate remedy at law." *Smith v. Burilley*, 733 F. Supp. 509, 515 (D.R.I. 1990); *see also Brown v. Amaral*, 460 A.2d 7, 10 (R.I. 1983). Consequently, federal courts closely scrutinize four factors before granting such relief: (1) the likelihood of irreparable harm to the plaintiff if the requested relief is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits of its claims; and (4) the public interest. *See SW Indus., Inc. v. Aetna Cas. & Sur. Co.*, 646 F. Supp. 819, 821 (D.R.I. 1986).

The four factors in this case warrant denial of the preliminary injunctive relief in this case. Of the four counts of the Plaintiff's Amended Complaint relevant to the relief sought, three are likely to be dismissed for legal and factual insufficiency. The fourth, for violation of the Rhode Island Uniform Trade Secret Act, is also likely fated to fail since the customer information at issue in this action does not constitute a trade secret under clear and controlling caselaw. Thus, Meller cannot demonstrate a likelihood that it will succeed on the merits of its claims. In addition, Meller will not suffer irreparable harm if it is denied injunctive relief. On the other hand, the Defendants will be significantly prejudiced if a preliminary injunction issues. Meller is attempting to prevent the Defendants from contacting numerous companies in connection with their new business, Design Research Optics. Essentially, Meller is trying to obtain a non-compete with

regard to those customers. Inability to contact those customers in the start-up phase of its business and to use those customers to help build its reputation could impair Defendants' ability to grow their new venture by imposing arbitrary limits on their ability to market. The resulting losses would be impossible to measure and compensate through an award of monetary damages.

For these reasons, which are discussed further below, Meller's Motion for Preliminary Injunction should be denied.

## 1. MELLER CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS

The First Circuit considers it "critical" that a party seeking a preliminary injunction show that it is likely to succeed on the merits of its claims. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996); *Auburn News Co. v. Providence Journal Co.*, 659 F.2d 273, 277 (1st Cir. 1981), *cert. denied,* 455 U.S. 921 (1982). In this case, Meller can make no such showing as one of its claims fails as a matter of law, it has not alleged facts to support its contract-based claims, and it cannot establish a trade secret to support its other claims.

### a. Count IX for Common Law Misappropriation of Trade Secrets is Legally Insufficient

Count IX of the Amended Complaint is titled "Misappropriation of Trade Secrets" and appears to have been asserted under Rhode Island common law. This Court, however, has held that "there is no common law claim under Rhode Island law for misappropriation of trade secrets" and that misappropriation of trade secrets "is only a statutory cause of action in Rhode Island." *Magnum Defense, Inc. v. Harbour Group*

*Ltd.*, 248 F. Supp. 2d 64, 71 (D.R.I. 2003). Because this cause of action does not exist, Meller clearly is not likely to succeed on the merits of this claim.

**b. Meller is not Likely to Prevail on Counts V and VI Because it has not Alleged Any Facts to Establish a Breach of the Sales Representative Agreement**

Counts V and VI relate to Meller's assertion that Defendant Nippon has breached paragraph 5 of its Sales Representative Agreement with Meller. Meller describes in the Amended Complaint the precise conduct that it asserts constitutes a breach of that provision. In Count VI, for breach of the Agreement, Meller alleges as follows:

> Nippon has breached paragraph 5 of the Sales Representative Agreement by refusing to return to Plaintiff, Plaintiff's trade secrets and other confidential information and using such information in connection with Defendants' competing business Design Research Optics.

Amended Complaint ¶ 93. Similarly, in Count V, which alleges that Nippon breached the implied covenant of good faith and fair dealing of the Agreement, Meller alleges that Nippon's breach consists of "failing to return and using Plaintiff's trade secrets and other confidential information in connection with a competing business." *Id.* ¶ 88.

In both Counts, the only acts of breach alleged are failure to return and use of the allegedly confidential information. However, paragraph 5 of the Agreement does not require return of confidential information; nor does it prohibit Nippon from using such information. That paragraph states, in relevant part:

> Representative agrees, that absent Employer's express consent and except while conducting the Employer's business, he **shall not disclose** to any person or entity any proprietary information regarding Employer relative to its business, customer, products, prices, other employees or manner of doing business.

*See* Exhibit C to the Amended Complaint (emphasis added). The only conduct prohibited by the provision is disclosure of confidential information. Because there are no

allegations that Nippon has disclosed any confidential information (and no evidence exists to support such a contention), Meller cannot show a likelihood of success on the merits of Counts IV and V of its Amended Complaint.

In addition, the non-disclosure obligation set forth in paragraph 5 of the Agreement, by its own terms, "shall not be construed to apply to proprietary trade information relating to the business conducted by Laser Research Optics after [Nippon] is no longer under contract with [Meller]." *See* Exhibit C to the Amended Complaint. According to this language, Nippon is not prohibited from using customer information relating to business conducted by LRO after Meller terminated Nippon's contract. If LRO is doing or has done business with the customers at issue on or after June 30, 2005, then the non-disclosure provision of Paragraph 5 does not apply to that customer information.

Finally, to make a claim for violation of this contract provision, Meller would have to establish that the information at issue was, in fact, proprietary. For the reasons set forth in the next section of this memorandum, Meller is also unlikely to prevail on its claims due to the fact that customer contact information is not proprietary in the CO2 laser optic component industry.

**c. Meller is not Likely to Succeed in Proving that the Customer Information at Issue in this Action Constitutes a Trade Secret**

Meller is seeking a preliminary injunction against Nippon's "use" of its allegedly confidential customer information. As set forth in the fact section of this brief, and as will be clear from the evidence submitted at trial, the information at issue is contact information for companies that, at some point in the past, purchased products from LRO. The contact information includes names, addresses, phone numbers, fax numbers,

companies or quotations submitted by LRO to the companies. That information resides in separate datafiles which Nippon has removed from its computers and archived onto CD Rom discs. Defendants have not and are not using that information in connection with the operation of Design Laser Research. What Defendants have done and are doing is using their industry contact information to inform their contacts that they are no longer associated with Meller and have started a new company offering CO2 laser optic component products.

Meller hopes to prevent Nippon from using the contact information at issue to solicit customers. Meller asserts that the information is trade secret information that belongs to Meller. Meller is not likely to succeed on that claim under the Rhode Island Uniform Trade Secrets Act, R.I. Gen. Laws § 6-41-1 *et seq.*

The general rule under Rhode Island law provides that "absent some form of agreement not to compete, the courts will not enjoin the solicitation by a former employee of customers serviced by him when he was so employed." *Callahan v. Rhode Island Oil Co.*, 240 A.2d 411, 412 (R.I. 1968). An exception to that rule exists only where it is shown that the employee obtained "confidential and secret information . . . as a result of the trust and confidence of previous employment." *Id. citing A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 203 A.2d 469 (Pa. 1964). The circumstances under which a customer list may constitute a trade secret under this exception are well defined in Rhode Island case law beginning with the seminal *Colonial Laundries* case.

In *Colonial Laundries, Inc. v. Henry*, 138 A. 47, 1927 R.I. LEXIS 87 (R.I. 1927), the Rhode Island Supreme Court held that a list of customers representing a laundry route to be called upon by the plaintiff's employees was the type of customer list that a former employee could be enjoined from using. The court expressly contrasted such a list from a list of potential customers used by a traveling salesman. The court noted that a traveling salesman is selling to "persons engaged in certain lines of business and whose identity may be quickly known to any one who cares to examine a directory or trade index." 1927 R.I. LEXIS *11. Whereas, the court explained, in the case of a laundry route, "a definite group has been gathered together by the employer, not of persons who may deal with him, but who, unless solicited otherwise, almost certainly will do so." *Id.* Unlike the laundry route owner,

> The traveling salesman has no assurance of an order unless he can satisfy the customer that his merchandise is cheaper, better, or more salable than his competitors. The customer each time desires to examine, inspect and compare merchandise and prices offered to him. Each sale is a distinct transaction, carrying no implication that another will follow. The list of people upon whom he calls has no market value, apart from a general good opinion of the employer's methods and goods and prices.

*Id.* at *11-12.

The multitude of cases considering this issue in the wake of the *Colonial Laundries* case has recognized and further defined this distinction. In *Callahan v. Rhode Island Oil Co.*, 240 A.2d 411 (R.I. 1968), the court declined to hold that the customers for plaintiff's petroleum products were confidential. The court in that case articulated a standard that has become the benchmark in this area: "[W]here the identity of customers is readily ascertainable through ordinary business channels or through classified business or trade directories, the courts refuse to accord to the list the protection of a trade secret."

240 A.2d at 413-14 *quoting Town and Country House and Homes Servs. v. Evans,* 189 A.2d 390 (Conn. 1963).

In *Go-Van Consolidators, Inc. v. Piggy Back Shippers, Inc.*, 306 A.2d 164 (R.I. 1973), the court upheld the denial of an injunction that would have prohibited the plaintiff's former employee from soliciting plaintiff's customers. In so holding, the court refused to classify the plaintiff's customer list as a trade secret. The court distinguished the facts in *Colonial Laundries* and explained:

> A business with extensive involvement in the solicitation of interstate shipment of freight is not conducted in a clandestine fashion. Although Go-Van's customers represented a wide array of industries, the fact that they use the facilities offered by interstate carriers is readily ascertainable and a matter of common knowledge within the business community. The information which is the subject of the present controversy would be known to anyone working for a living in the freight solicitation business – a business in which [the Defendant] is well-experienced and free to work.

306 A.2d at 165-66.

Other decisions have followed this rationale and refused to elevate customer lists to trade secret status absent a showing that the lists were developed from confidential sources and/or that the information in them could not be ascertained from ordinary business channels.[4] *See, e.g., Paramount Office Supply Co., Inc. v. D.A. MacIsaac, Inc.*, 524 A.2d 1099 (1987)(finding that list of plaintiff's customers in the office products supply business was information that could be obtained from business directories and were customers who dealt with more than one distributor at a time); *Chemart Co. v. Nixon*, 1992 R.I. Super. LEXIS 53 (customer list not a trade secret where the parties use

[4] In the instances in which a plaintiff succeeded in enjoining use of a customer list, the cases almost without exception involved evidence that the defendant employee abused the employer's trust by dealing with customers for his own gain while still employed. *See, e.g., Colonial Laundries; Rego Displays, Inc. v. Fournier*, 379 A.2d 1098 (R.I. 1977); *Baris v. Steinlage*. 2003 R.I. Super. LEXIS 154; *Abbey Med.-Abbey Rents, Inc. v. Mignacca*, 1983 R.I. Super. LEXIS 3. No such facts are alleged or exist in this case.

the same sources to obtain customer information and customers buy from more than one source); *The Warwick Group, Inc. v. Cipolla*, 1986 R.I. Super. LEXIS 200 (denying injunctive relief where "[t]he customers of the printing business are readily ascertainable by the diligent, imaginative and resourceful salesperson."); *Prelude Foods Int'l, Inc. v. Connors*, 1982 R.I. Super LEXIS 172. In so deciding, the courts in those cases undertook "the delicate task of balancing the employee's right to compete and earn a living against the employer's right to be protected from unfair competition." *Go-Van*, 306 A.2d at 165. They looked to several factors to determine whether the customer information at issue should be considered a trade secret and, therefore, whether the defendant should be enjoined from using such information. Those factors include:

> Can customers be identified from business and trade directories? (*Calahan; Chemart)*
>
> Do customers buy from more than one source? (*Paramount; Chemart)*
>
> Is each sale a distinct transaction? (*Chemart;Colonial Laundries)*
>
> Do customers generally obtain quotes from more than one vendor? (*Chemart*)
>
> Is the information that the employer seeks to protect information that would be known to anyone working in the employer's industry? (*Warwick Group;Go-Van;Chemart*)
>
> Does the customer list lack any market value apart from the customers' opinion of the seller's goods and services? (*Colonial Laundries*)

In the cases where the answer to one or more of these questions was yes, courts have consistently found that the customer list was not a trade secret. In this case, the answer to each of these questions is yes.

Defendant Bruce Sunderland has devoted his 28-year career to marketing and selling CO2 laser optic components. He will testify about the numerous resources

available to identify customers for such products. They include trade directories, such as the Thomas Register and the Zycon Directory; trade shows; trade journals; and buyer's guides. These references identify companies in the industries that use CO2 lasers, including laser metal cutters, laser fabricators, and medical OEMs, among others. In his experience, Sunderland has also located customers through cold calls and unsolicited inquiries. Significantly, these are exactly the sources of customer names identified to the court in the *Chemart* case, where the court declined to find that the plaintiff's customer list was a trade secret. There simply is no mystery about who the customers are for CO2 laser optic components or how to find them. Any resourceful person working to find buyers for these products will have no trouble doing so from ordinary business channels and trade directories.

Mr. Sunderland will also testify about his experience responding to inquiries from potential customers. Often he is asked to meet or match a competitor's quote. If he succeeds in winning the order, there is no guarantee of additional sales. Each order must be won through performance and competitive pricing and delivery. Customers buy from more than one source and generally require their suppliers to compete with each other to offer the best price on each order.

Finally, the customer list in this case has no market value apart from the opinion that the customers may have of LRO's goods and services. When Sunderland sold his LRO business to Meller ten years ago, <u>Meller paid only $1.00 for LRO's brand name and customer information</u>. Obviously Meller did not view the customer list it obtained as having any market value. Moreover, when it contracted first with Sunderland and later

with Nippon to serve as its sales agent, Meller never imposed any restriction on either's post-employment use of that information.

In order to establish that its customer information is a trade secret, Meller would also have to show that it undertook efforts "reasonable under the circumstances to maintain its secrecy." R.I. Gen. Laws § 6-41-1(4)(ii). Meller took no such steps. It has no written policy regarding the confidentiality of such information. Nor does it require its employees to sign confidentiality agreements regarding the status and use of such information. And, in the case of Sunderland and Nippon, it only prohibited them from disclosing not using the information.

Based on these facts, the customer contact information at issue in this case falls squarely within the precedent of *Callahan* and the subsequent cases cited above where courts refused to confer trade secret status on ordinary customer lists.

**2. MELLER WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF**

The court in the *Chemart* case noted that the loss of any business from a current list of customers due to the solicitation by a former employee "can be readily ascertained and liquidated damages awarded accordingly." 1992 R.I. Super. LEXIS 53. That conclusion applies equally to this case. If the court ultimately determines that the customer contact information at issue in this action is a trade secret or that Nippon breached a contractual obligation in using such information, the damage caused by Nippon's use of that information can be easily calculated and remedied through an award of monetary damages. Thus, Meller will not suffer irreparable harm if the Court denies its request for preliminary injunctive relief.

## 3. THE DEFENDANTS WILL BE IRREPARABLY HARMED IF INJUNCTIVE RELIEF IS GRANTED

The injunctive relief that Meller is seeking would, essentially, prohibit the Defendants from contacting colleagues and customers with whom Nippon and Sunderland have worked for numerous years. It would be impossible to measure the effect that such a restriction would have on the growth and sales of Defendants' start-up enterprise.[5] If a preliminary injunction issued and, subsequently, Defendants defeated Meller's trade secret and breach of contract claims at trial, there is no monetary remedy that can adequately compensate the Defendants for the incalculable losses they would have incurred as a result of the preliminary injunction.

## 4. THE PUBLIC INTEREST SUPPORTS DENIAL OF PRELIMINARY INJUNCTIVE RELIEF

Public policy generally favors unrestrained competition and an individual's ability to secure gainful employment in his field. The law also recognizes the public's interest in preventing unfair competition. These competing interests are the foundation of the analysis described above that is used by Rhode Island courts to determine when customer lists are trade secrets. When that analysis is applied to the facts of this case, it is clear that no injunction should issue. Accordingly, it is in the public interest in this case to deny the injunctive relief sought because that is how the competing interests are resolved in this case according to relevant and controlling case law.

---

[5] Among other things, customers of CO2 laser optic components generally purchase from more than one supplier. Accordingly, Defendants' damages cannot merely be measured in terms of the sales Meller obtained from the customers in question. And it would be impossible to say which of the customer's non-Meller sales would have gone to the Defendants but for the restriction on solicitation.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully submit that Meller's Motion for Preliminary Injunction be denied.

Respectfully submitted,

Craig M. Scott, Esq. (#4237)
Stacey P. Nakasian, Esq. (#5069)
Duffy Sweeney & Scott, LTD
One Turks Head Place, Suite 1200
Providence, Rhode Island 02903
(401) 455-0700
(401) 455-0701 (Fax)

Attorneys for the Defendants

Dated: August 8, 2005

**CERTIFICATION**

TO: William R. Grimm, Esq.
Hinckley, Allen & Snyder, LLP
1500 Fleet Center
Providence, RI 02903

I hereby certify that I caused a true copy of the within *Memorandum In Support Of Defendants' Opposition To Plaintiff's Motion For Preliminary Injunction* to be hand-delivered to the above-named counsel of record on the 8th day of August 2005.

______________________________